UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KARL WIRTH,<br><br>   Plaintiff,<br><br>v.<br><br>SALESFORCE, INC.<br><br>   Defendant. | Civil Action No: _____<br><br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT**

**Introduction**

1.      On September 20, 2022, Salesforce, Inc. (NYSE: CRM) made a major public announcement at its annual Dreamforce conference: It had developed "Genie" a Customer Data Platform ("CDP"), that can process and deliver data in "real-time," integrated with and powering the Salesforce Platform. To illustrate the significance of this breakthrough, Salesforce showed the following graphic in its keynote address:



This was, according to Salesforce "the biggest announcement Salesforce has made since [its founders] started the company."

2. As was intended, the announcement sparked excitement from industry analysts:

- "Genie is a new customer data platform built on Salesforce's native platform - Hyperforce. Genie automatically updates the entire Salesforce platform with real-time data . . . This allows Salesforce's Customer Data Platform to generate real-time customer 360 views . . . The new product already has ~500 customers." (Albert Lin, Salesforce Investor Day: Everything You Need to Know, SEEKING ALPHA (Sept. 23, 2022), https://seekingalpha.com/article/4542644-salesforce-investor-day-everything-you-need-to-know).

- "With the launch of the Salesforce Genie platform, a hyper scale real-time data platform, the company has reinforced their focus on delivering a solution that is powered by automation and intelligence in real time. This should drive greater enablement of Salesforce's ultimate goal of providing a 360 view of customers through data that lives across multiple products and ecosystems. With the company's own public cloud architecture, Hyperforce, driving the underlying platform, businesses can stream real time customer data from web, mobile, apps and other devices. Genie is a fast growing, organic product that can elevate the usage, insight and overall value proposition of Salesforce products as it marries numerous data points for a more holistic view." (Kash Ragan et al., Salesforce.com Inc. (CRM): Dreamforce Wrap-Up: Closing Thoughts, GOLDMAN SACHS (Sept. 23, 2022)).

- "Salesforce launched Genie which effectively extends the real-time data lake functionality behind the CDP from Marketing to Sales, Service, Commerce. We believe Genie could help Salesforce differentiate within CDP, get deeper into B2C [business-to-consumer] front-office, and drive more platform stickiness." (Rishi Jaluria et al., Highlights (So Far) from Dreamforce & A-Day: Targeting $50B in Revs, 25%+ Margins in FY 26, RBC CAPITAL MARKETS (Sept. 21, 2022)).

- "All the data that lives in Salesforce and the silos that come with it are now a thing of the past with the announcement of Genie (generally available today), which is a data integration model that powers Salesforce's Customer 360 portfolio with data that can be used for creating customer experiences in real time." (Dreamforce '22 – How to Make a Dollar Out of 25%+, Wolfe Research (Sept. 22, 2022)).

2. It was all a lie. So much so that, shortly after the Dreamforce announcement, Salesforce employees openly expressed their shock and concern about the false statements in a company-wide Slack channel called #airing-of-grievances. As one employee succinctly explained:

> If we had told customers that we are going to follow that path and deliver this unified solution that will make all their [real-time] dreams come true, it would be okay (even if we missed the mark, down the road). That is not what we told them. We told them it exists, in the now. As presented, it doesn't. That's a problem.

\*   \*   \*

3. This is an action under Section 806 of the Sarbanes-Oxley Act of 2002 ("SOX") for retaliation against a whistleblower. As alleged below, the "Genie" platform does not operate in "real-time" and, in fact, Salesforce has no intention of making it do so. In 2022, Plaintiff—then a Salesforce executive—reasonably believed that publicly claiming that "Genie" operated in "real-time" without actually having (or even intending to have in the near future) such a capability would be fraudulent, and likely violate numerous provisions of Federal law relating to fraud against shareholders, as well as rules and regulations of the Securities and Exchange Commission ("SEC"). Plaintiff brought these concerns to numerous individuals within Salesforce who had the authority to investigate, discover, or stop this fraudulent scheme from coming to fruition and, more specifically, to prevent Salesforce from making false statements at Dreamforce about the supposed real-time capabilities. They refused to do so and, instead, participated in a campaign to discredit and diminish Plaintiff's standing in the company, resulting in his termination just days before the fraudulent scheme came to fruition.

4. Plaintiff now brings this action to recover for the harms he has suffered from his retaliatory termination, and to advance the important public policies of SOX: protecting public

investors and ensuring the integrity of public markets by strongly protecting whistleblowers at public companies from retaliation.

## Parties and Jurisdiction

5. Plaintiff, Karl Wirth, is a citizen of Massachusetts residing at 7 Homestead Circle, Bedford, Massachusetts.

6. Salesforce is a publicly traded company organized under the laws of Delaware. Its principal place of business in San Francisco, California.

7. This Court has jurisdiction over Plaintiff's claim pursuant to 28 U.S.C. § 1331 because Plaintiff's claim arises under the laws of the United States.

8. Venue is proper in this District under 28 U.S.C. §1391 because a substantial part of the events giving rise to the claim occurred within the Commonwealth of Massachusetts.

9. Plaintiff has complied with all administrative prerequisites to this action. Plaintiff timely filed an administrative complaint with the Secretary of Labor pursuant to 18 U.S.C. § 1514A(b)(1)(A) on January 26, 2023. More than 180 days have now passed since the filing of Plaintiff's complaint to the Secretary of Labor and the Secretary has not issued a final decision thereon. Accordingly, pursuant to 18 U.S.C. § 1514A(b)(1)(B), Plaintiff may now file this action in this Court.

## Facts

10. Plaintiff is an accomplished executive and entrepreneur. He co-founded a technology company called Evergage, Inc. ("Evergage") in 2010 and served as its CEO for ten years.

11. Among the offerings developed by Evergage was a personalization technology that enabled businesses to receive digital information about customers and prospects as they interacted

with the business online; to process and organize that information; and then to use that information to offer personalized marketing to its customers or prospects—all in real-time, meaning within milliseconds.

12. Salesforce purchased Evergage in 2020. As part of the sale, Plaintiff agreed to become a Salesforce executive.

13. Plaintiff's original title at Salesforce was Vice President of Product Management. His responsibilities included further developing the personalization offering he had brought to Salesforce from Evergage, supporting the sale of that offering, and integrating that technology into Salesforce's products and technologies.

14. Plaintiff was extremely successful in his role at Salesforce, as he helped make the Evergage acquisition one of the most successful acquisitions in Salesforce's history.

15. Evergage's technology was initially rebranded at Salesforce as "Interaction Studio," and later, as Salesforce Marketing Cloud Personalization.

16. Plaintiff's team, which worked on Interaction Studio/Marketing Cloud Personalization (the "IS Team") worked parallel to another group within Salesforce that worked on its CDP product (the "CDP Team").

17. A CDP (Customer Data Platform) is a generic term within the marketing software industry referring to software that collects information about customers from multiple sources, combines and organizes the information, and then allows the information to be used by other systems for marketing purposes.

18. Salesforce's CDP did not have real-time capabilities. While it was able to execute some functions such as information collection in real time, other operations such as the processing and organizing of that data took hours to complete.

19. Within Salesforce, Plaintiff advocated for making its CDP operate in real-time. This drew strong opposition from members of the CDP team, who argued that customers did not actually need the CDP to operate in real-time.

20. In or around late 2021 or early 2022, Salesforce made a corporate decision to accept Plaintiff's recommendation and to pursue making its CDP operate in real-time. Upon information and belief, that decision was driven primarily by Salesforce's view that real-time would provide significant marketing benefits, irrespective of whether it actually improved the customer experience.

21. Indeed, given the significant benefit of being able to publicly describe its CDP as operating in "real-time," Salesforce soon began planning to make this real-time capability a central focus of its upcoming Dreamforce conference, which was scheduled to take place September 20-22, 2022 in San Francisco.

22. For example, Steve Fisher, an Executive Vice President who was senior to Plaintiff, instructed Plaintiff to assist in drafting scripts for Dreamforce 2022 describing Salesforce's CDP as having real-time capabilities.

23. Plaintiff was promoted to Senior Vice President in January 2022 and was tasked with overseeing the incorporation of real-time into the CDP.

24. In the ensuing weeks and months, it became apparent that the CDP team remained opposed to incorporating real-time and did not intend to develop the technology in time for Salesforce's planned Dreamforce announcement.

25. Among other things, the CDP team wanted to redefine the meaning of "real-time," so that it could falsely claim that the CDP operated in real-time, when in fact many of its processes took several hours.

26. Plaintiff reasonably believed that publicly claiming the CDP operated in "real-time" without actually having (or even intending to have in the near future) such a capability would be fraudulent, and likely violate numerous provisions of Federal law relating to fraud against shareholders, as well as rules and regulations of the Securities and Exchange Commission ("SEC"). These violations of laws, rules, and regulations included, but are not limited to the following:

    a. 18 U.S.C. § 1348 (Securities and Commodities Fraud),

    b. Rule 10b-5 (17 CFR § 240.10b-5(a)–(c)),

    c. Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") (15 U.S.C. § 78j(b)), and

    d. Section 17(a) of the Exchange Act (15 U.S.C. § 77q(a)).

27. Plaintiff brought his concerns about the CDP team to numerous individuals within Salesforce who had the authority to investigate, discover, or stop this fraudulent scheme from coming to fruition and, more specifically, to prevent Salesforce from making false statements at Dreamforce about the supposed real-time capabilities of its CDP ("Whistleblowing Activities").

28. Plaintiff's Whistleblowing Activities included monthly meetings with other key executives within his larger business unit at Salesforce, in which Plaintiff shared his concerns regarding the CDP team's refusal to integrate real-time. This included visual progress reports during those meetings in which Plaintiff color-coded information in red and orange to indicate that progress was not being made in the integration work.

29. Plaintiff's Whistleblowing Activities also included a May 5, 2022 meeting with his direct supervisor, Lidiane Jones ("Ms. Jones"), in which Plaintiff specifically raised his concerns

about the CDP team and its refusal to integrate real-time in accordance with the planned Dreamforce announcement.

30. At or about that same time, Ms. Jones began a deceitful campaign to diminish Plaintiff's standing in the company and potentially have him terminated.

31. Among other things, Ms. Jones solicited negative feedback concerning Plaintiff from individuals whom Ms. Jones knew would falsely claim that his performance was deficient. This included members of the CDP team, whom Ms. Jones knew bore retaliatory animus towards Plaintiff on account of his Whistleblowing Activities.

32. Utilizing that negative feedback, in July 2022 Ms. Jones falsely claimed that Plaintiff was "unable to collaborate effectively with others," "more focused on being right than doing the right thing," and was perpetuating a "hostile environment."

33. Plaintiff was confident that Ms. Jones' campaign against him was a pretext for some unlawful animus, and suspected that his age might be a significant factor.

34. In the weeks that followed, there were numerous meetings—to which Plaintiff was not invited—where senior leaders discussed the status of real-time integration into the CDP. Upon information and belief, the decision was made at these meetings to falsely claim at Dreamforce that Salesforce had successfully integrated real-time into its CDP.

35. While Plaintiff did not have direct knowledge of this plan, he remained reasonably concerned that such a fraudulent scheme existed and continued to engage in Whistleblowing Activities to prevent it from coming to fruition.

36. For example, in late August 2022, approximately four weeks before the start of Dreamforce, Plaintiff sent a Slack message (a form of instant messaging) to his supervisor, Ms. Jones, and a number of other executives within his broader business unit to address Salesforce's

8

planned announcements at Dreamforce. In this message, Plaintiff made clear that Salesforce could not truthfully claim that its CDP operated in real-time, as that capability had not yet been integrated and was not even close to coming to fruition.

37. Several of the executives included in this Slack message, including Ms. Jones, had the authority to investigate, discover, or stop Salesforce from making false statements at Dreamforce about the supposed real-time capabilities of Salesforce's CDP.

38. On September 9, 2022, Plaintiff engaged in additional Whistleblowing Activities during a 1:1 meeting with Parker Harris ("Harris"), Salesforce's co-founder and CTO. Among other things, Plaintiff informed Mr. Harris of CDP's refusal to integrate real-time, and Ms. Jones' use of false criticisms as a pretext for diminishing his standing in the company, and potentially causing his termination.

39. Hours later, Plaintiff was fired.

40. At Dreamforce, and in a number of other roughly contemporaneous public statements, Salesforce executives including then-co-CEO Bret Taylor proceeded to make numerous egregiously false statements about the capabilities of its CDP and the CDP's integration with Salesforce's platform, which it called "Genie." Among other things, those statements included false representations that:

    a.    Genie was integrated with Salesforce's personalization product,

    b.    Genie already had the ability to perform its functions in real-time, meaning within milliseconds, and

    c.    Genie allowed Salesforce to offer the world's first real-time CRM (or customer relationship management) platform—in other words, that Genie was integrated with the full set of Salesforce's product offerings, and enabled that whole set of offerings (the CRM) to work in "real time."

41.     Salesforce illegally terminated Plaintiff's employment in retaliation for his actions in providing information, to his supervisor and other persons working for Salesforce with authority to investigate, terminate, or discover misconduct, about conduct that he reasonably believed would likely (and in fact did) violate 18 U.S.C. § 1348, rules and regulations of the SEC, and provisions of federal law relating to fraud against shareholders, including those cited above.

42.     Plaintiff's termination was an act of illegal whistleblower retaliation in violation of the Sarbanes-Oxley Act, 18 U.S.C. § 1514A.

## COUNT I

**Whistleblower Retaliation in Violation of SOX Section 806, 18 U.S.C. § 1514A.**

43.     Plaintiff realleges and incorporates the above paragraphs as if fully set forth herein.

44.     By and through the conduct set forth above, Salesforce terminated and otherwise discriminated against Plaintiff in retaliation for his repeated providing of information to persons with supervisory authority over him, and to other persons working for Salesforce who had the authority to investigate, discover, and terminate misconduct, concerning conduct he reasonably believed constituted violations of rules and regulations of the Securities and Exchange Commission and provisions of federal law that relate to fraud against shareholders, as well as violations of the same that were likely to occur.

45.     This conduct about which Plaintiff provided information included conduct that he reasonably believed was violative of, and/or was likely to violate, Exchange Act Rules 13a-15(a) and 15d-15(a), Section 806 of SOX, and Sections 13(b)(2)(B) and (b)(5) of the Exchange Act.

46.     As a direct and proximate result thereof, Plaintiff has suffered and continues to suffer damages, including, but not limited to, loss of compensation and benefits, reputational harm and lost earning capacity, other financial losses, and emotional distress damages.

**Prayer for Relief**

WHEREFORE, Plaintiff respectfully requests that this Court:

1. Enter judgment in Plaintiff's favor on his claim against Defendant;

2. Award Plaintiff monetary damages, including for lost compensation, reputational harm, lost earning capacity, and emotional distress, with interest;

3. Award Plaintiff front pay;

4. Award Plaintiff punitive damages;

5. Award Plaintiff his attorneys' fees and all other costs of litigation; and

6. Order such further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury on his claim.

Respectfully submitted,
**Karl Wirth**,
By his attorneys,

*/s/ Patrick J. Hannon*
Patrick J. Hannon (BBO #664958)
Hartley Michon Robb Hannon LLP
101 Federal Street, Suite 1810
Boston, MA 02110
phannon@hmrhlaw.com
P: (617) 723-8000

Date: July 28, 2023