UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KARL WIRTH, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) Civil Action No. 23-CV-11718-AK |
| v. | ) |
| | ) |
| SALESFORCE, INC., | ) |
| | ) |
| Defendant. | ) |
| | ) |

## MEMORANDUM AND ORDER ON DEFENDANT'S MOTION TO DISMISS

**ANGEL KELLEY, D.J.**

Salesforce, Inc. ("Salesforce") hired Plaintiff Karl Wirth ("Wirth") as Vice President of Product Management as part of its acquisition of Wirth's former company, Evergage, Inc. After learning Salesforce intended to make public statements he believed to be untrue, Wirth raised his concerns with several senior executives. Allegedly Salesforce responded by terminating him. Wirth then filed this lawsuit for whistleblower retaliation, and Salesforce subsequently filed a motion to dismiss. For the following reasons, Defendant's Motion to Dismiss the Amended Complaint [Dkt. 20] is **DENIED**.

### I. BACKGROUND

The following facts are taken from the Plaintiff's Amended Complaint [Dkt. 17], unless otherwise noted. In 2010, Wirth co-founded a technology company called Evergage, Inc. ("Evergage") and served as its CEO for ten years. [Id. ¶ 11]. Salesforce purchased Evergage in 2020 and as part of the sale, Plaintiff became Vice President of Product Management. [Id. ¶¶ 13-14]. Wirth's responsibilities included continuing to develop the marketing personalization

technology he had brought to Salesforce from Evergage and integrating it into Salesforce's products and technology. [Id.]. Plaintiff's team, which worked on Interaction Studio/Marketing Cloud Personalization (the "IS Team"), worked alongside another Salesforce team that worked on its Customer Data Platform product (the "CDP Team"). [Id. ¶ 17]. According to Wirth, Salesforce's Customer Data Platform ("CDP"), named Genie, was not capable of performing in real time—i.e., within milliseconds—because some of its necessary functions took hours to complete. [Id. ¶ 19]. Although Genie could collect information in real time, "other necessary functions, such as the processing, organiz[ation], and distribution of that data, each took hours to complete." [Id.]. These slower functions prevented Genie from operating in real time, as "the CDP could not operate faster than its slowest moving function." [Id.].

A Customer Data Platform refers to software that collects and combines customer information from various sources to create a single, centralized customer database that can be used by other systems for marketing purposes. [Id. ¶ 18]. Because Salesforce believed announcing that its CDP operated in real time would have enormous marketing benefits in late 2021 or early 2022, the company began planning on making this real-time capability the highlight of its upcoming Dreamforce conference, scheduled for September 20, 2022. [Id. ¶¶ 24-25]. Wirth was involved in that planning, as he helped draft the scripts for Dreamforce, which described Genie as having the ability to operate in real time. [Id. ¶ 26].

Dreamforce is Salesforce's annual conference that the company often uses to announce new products and offerings and that is attended by tens of thousands of industry professionals. [Id. ¶ 27]. If Salesforce announced at Dreamforce that Genie could operate in real time, that information would be widely shared throughout the marketing industry, including to customers and investors. [Id.].

In January 2022, Wirth was promoted to Senior Vice President. [Id. ¶ 28]. In that role, he was responsible for supervising the work required for the CDP to operate in real time, although he did not have any actual authority over the CDP team responsible for completing that work. [Id.]. In the months and weeks leading up to Dreamforce, it became clear to Wirth that the CDP team did not intend to develop real time capabilities and that Genie would not be able to perform in real time before the Dreamforce announcement. [Id. ¶ 29]. In other words, Wirth believed that the program could not complete all of its necessary functions within milliseconds. [Id. ¶¶ 31-32]. As a result, the misrepresentation of Genie's real-time capability would likely lead to a violation of federal laws, rules, or regulations related to fraud unless he tried to stop it. [Id. ¶¶ 32-33].

Consequently, Wirth shared his concerns with senior executives at monthly meetings about the CDP team's refusal to integrate real-time capabilities. [Id. ¶ 35]. Wirth also met with his direct supervisor, Lidiane Jones ("Jones"), on May 5, 2022. [Id. ¶ 36]. He alleges that at around that time, Jones made a concerted effort to diminish his standing at Salesforce and to potentially have him fired by requesting negative feedback about Wirth from individuals who Jones knew would falsely claim that his performance was lacking. [Id. ¶¶ 37-38]. Using that negative feedback, in July 2022 Jones claimed that Wirth was "unable to collaborate effectively with others" and that he was maintaining a "hostile work environment." [Id. ¶ 39].

In the following weeks, there were numerous meetings that Wirth did not attend in which senior Salesforce leaders discussed the status of real-time integration into Genie. [Id. ¶ 41]. Plaintiff believes that it was in these meetings that senior executives decided to falsely claim at Dreamforce that their CDP had real-time capability. [Id.]. Despite not being part of those discussions, Wirth remained worried about what was happening. Therefore, he continued raising

his concerns with individuals who "had the authority to investigate, discover, or stop" false statements from being made at Dreamforce regarding Genie's real-time capabilities. [Id. ¶¶ 43, 45]. In August 2022, Wirth sent an instant message to Jones and other Salesforce executives within his broader business unit to discuss his concerns regarding the planned announcements at Dreamforce. [Id. ¶ 44]. Wirth told them that Genie was far from being able to operate in real time and that Salesforce could not truthfully claim that its CDP could do so. [Id.].

On September 9, 2022, Wirth had an individual meeting with Parker Harris ("Harris"), Salesforce's co-founder and CTO. [Id. ¶ 46]. During the meeting, Wirth told Harris the CDP team refused to integrate real time and that Jones was using false criticism to damage his reputation at the company and to potentially cause his termination. [Id.]. Hours later, Wirth was fired. [Id. ¶ 47].

Plaintiff argues that Salesforce wrongly terminated his employment in retaliation for raising concerns about Salesforce planning to falsely state that Genie had real-time capabilities when Wirth believed it did not. [Id. ¶ 59].

On July 28, 2023, Wirth filed this lawsuit against Salesforce.

## II.     LEGAL STANDARD

### A.     Motion to Dismiss

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must contain sufficient factual material to state a claim for relief that is "plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). Reading the complaint "as a whole," the Court must conduct a two-step, context-specific inquiry. García-Catalán v. United States, 734 F.3d 100, 103 (1st Cir. 2013). First, the Court must perform a close reading of the complaint to distinguish factual allegations from conclusory legal statements. Id. Factual

allegations must be accepted as true, while legal conclusions are not entitled to credit.  Id.  A court may not disregard properly pleaded factual allegations even if actual proof of those facts is improbable.  Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 12 (1st Cir. 2011).  Second, the Court must determine whether the factual allegations present a "reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

"A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" Id. (quoting Twombly, 550 U.S. at 555).  "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" Id. (quoting Twombly, 550 U.S. at 557).  In determining whether a complaint crosses the plausibility threshold, "the reviewing court [must] draw on its judicial experience and common sense." Id. at 679.  Dismissal is appropriate when the complaint fails to set forth "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." Gooley v. Mobil Oil Corp., 851 F.2d 513, 515 (1st Cir. 1988).

### B.    The Sarbanes-Oxley Act

The Sarbanes-Oxley Act of 2002 ("SOX") is intended to "'prevent and punish corporate and criminal fraud, protect the victims of such fraud, preserve evidence of such fraud, and hold wrongdoers accountable for their actions.'" Lawson v. FMR LLC, 571 U.S. 429, 434-35 (2014) (quoting S. Rep. No. 107-146, at 2 (2002)).  Specifically, "SOX protects 'whistleblower' employees of publicly-traded companies by prohibiting employers from retaliating against employees because they provided information about specified potentially unlawful conduct." Day v. Staples, Inc., 555 F.3d 42, 52 (1st Cir. 2009).  Before turning to the merits, this Court must first consider the applicable standard for analyzing the Wirth's claim.

Whistleblower claims alleging illegal retaliation are subject to a burden-shifting framework. First, the plaintiff must make a prima facie under the SOX whistleblower-protection provision, 18 U.S.C. § 1514A, by alleging: "'(i) the employee engaged in a protected activity or conduct; (ii) the [employer] knew or suspected, actually or constructively, that the employee engaged in the protected activity; (iii) the employee suffered an unfavorable personnel action; and (iv) the circumstances were sufficient to raise the inference that the protected activity was a contributing factor in the unfavorable action.'" Id. at 53 (quoting 29 C.F.R. § 1980.104(b)(1)). "The burden then shifts to the employer to show that it 'would have taken the same unfavorable personnel action in the absence of' the protected activity." Murray v. UBS Sec., LLC, 601 U.S. 23, 26 (2024) (quoting 49 U.S.C. § 42121(b)(2)(B)(iv)).

In a case called Platone v. FLYi, Inc., No. 04-154, 2006 WL 3246910 (Dep't of Labor Sept. 29, 2006), the Administrative Review Board of the U.S. Department of Labor ("ARB") found that a complaint must "approximate . . . the basic elements" of the kind of fraud or violation alleged. Platone, 2006 WL 3246910, at *11. Some Circuit courts adopted this approach, including the First Circuit. See e.g., Allen v. Admin. Rev. Bd., 514 F.3d 468, 480 n.9 (5th Cir. 2008) (In securities fraud cases, "the objective reasonableness of the employee's belief is evaluated in part through reference to the elements of a Rule 10b-5 claim"); Van Asdale v. Int'l Game Tech., 577 F.3d 989, 1001 (9th Cir. 2009) (agreeing with the First Circuit in Day v. Staples, Inc.). In Day, the First Circuit stated that "[t]o have an objectively reasonable belief there has been shareholder fraud, the complaining employee's theory of such fraud must at least approximate the basic elements of a claim of securities fraud." 555 F.3d 42, 55 (1st Cir. 2009). Two years after Day was decided, the ARB reversed course in Sylvester v. Parexel Int'l LLC, No. 07-123, 2011 WL 2165854 (Dep't of Labor May 25, 2011). The ARB rejected the

requirement that an employee's theory of impropriety must closely resemble the elements of the relevant fraud and stated that some courts had misinterpreted Platone's analysis. Sylvester, 2011 WL 2165854, at *18 (citing Day, 555 F.3d 42). Such a requirement "merged the elements required to prove a violation of a fraud statute, e.g. materiality and scienter, with the requirements a whistleblower must allege or prove to engage in protected activity." Id. Moreover, such a requirement conflicted with the protections of SOX, which did not require a complainant to "prove a violation of the substantive laws," but merely to have "a reasonable belief of a violation of the laws." Id.

The responses to Sylvester have been varied. See Wiest v. Lynch, 710 F.3d 121, 133 (3rd Cir. 2013) (granting Chevron deference and finding that the ARB's interpretation of SOX in Sylvester was reasonable "because there is nothing in the statutory text that suggests that a complainant's communications must assert the elements of fraud in order to express a reasonable belief that his or her employer is violating a provision listed in Section 806"); Rhinehimer v. U.S. Bancorp Invs., Inc., 787 F.3d 797, 810 (6th Cir. 2015) (applying Skidmore deference and noting that the purpose of the whistleblower statute "turns on employees' reasonable belief rather than requiring them to ultimately substantiate their allegations"); Beacom v. Oracle Am., Inc., 825 F.3d 376, 380 (8th Cir. 2016) (adopting the Sylvester "reasonable belief" standard without specifying a level of deference); Wadler v. Bio-Rad Lab'ys, Inc., 916 F.3d 1176, 1187 (9th Cir. 2019) (citing Sylvester and adopting that standard by stating that the plaintiff would only have to meet a "minimal threshold requirement" that the plaintiff "'reasonably believed that there might have been' a violation" (quoting Van Asdale, 577 F.3d at 1001)); Genberg v. Porter, 882 F.3d 1249, 1256 (10th Cir. 2018) (according Chevron deference to the Sylvester "reasonable belief" standard). But see Nielsen v. AECOM Tech. Corp., 762 F.3d 214, 221-22 n. 6 (2nd Cir. 2014)

(applying Skidmore deference but noting that "the purported whistleblower's belief cannot exist wholly untethered from [the specific provisions allegedly violated]"); Northrop Grumman Sys. Corp. v. U. S. Dep't of Lab., 927 F.3d 226, 235 n. 9 (4th Cir. 2019) (concluding that "the reasonableness of an employee's belief must be measured against the specific statutory provisions in § 1514A(a)(1) requiring approximation of the elements of shareholder fraud" without discussing whether to grant deference to the ARB's decision in Sylvester); Wallace v. Tesoro Corp., 796 F.3d 468, 479 (5th Cir. 2015) (declining to reconsider the Platone standard but noting that the Fifth Circuit had previously approvingly quoted Sylvester that SOX's "critical focus is on whether the employee reported conduct that he or she reasonably believes constituted a violation of federal law" (quoting Villanueva v. U.S. Dep't of Labor, 743 F.3d 103, 109 (5th Cir.2014)); Ronnie v. Off. Depot, LLC, 81 F.4th 1345, 1351 (11th Cir. 2023) (discussing Sylvester, adopting a "totality of the circumstances test," and concluding that "while the employee need not 'definitively and specifically' prove each element of fraud, he must make more than a conclusory allegation").

Sylvester was decided after Day, and the First Circuit has not since reconsidered whether an employee must approximate each element of fraud to establish a violation of the SOX whistleblower provision. Like the Third, Sixth, Ninth, and Tenth Circuits, this Court finds that the ARB's reasoning in Sylvester is persuasive; thus, it is entitled to Skidmore deference. See Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944) (holding that an agency's position is entitled to deference if it has the "power to persuade," based on considerations such as "thoroughness evident in [the agency's] consideration, the validity of [the] reasoning, [and] its consistency with earlier and later pronouncements."). As the Third Circuit notes, "there is nothing in the statutory text that suggests that a complainant's communications must assert the elements of fraud in order

8

to express a reasonable belief that his or her employer is violating" SOX's whistleblower provision. Wiest, 710 F.3d at 133.  Moreover, requiring an employee to wait for a violation to occur when an earlier report could have possibly prevented it would defeat the purpose of the statute.  Id.  Therefore, this Court adopts the Sylvester standard: "A whistleblower complaint concerning a violation about to be committed is protected as long as the employee reasonably believes that the violation is likely to happen."  2011 WL 2517148, at *14.[1]  The Court now turns to Wirth's Amended Complaint to evaluate whether it states a claim for relief under the standard announced in Sylvester.

### III.  DISCUSSION

#### A. Protected Activity

Protected activity under § 1514A is defined as "any lawful act done" by an employee to report information regarding any conduct the employee reasonably believes constitutes a violation of one of the specified federal criminal fraud statutes (18 U.S.C. § 1341 (mail fraud); § 1343 (wire fraud), § 1344 (bank fraud), § 1348 (securities fraud)); any rule or regulation of the SEC; or any federal law relating to fraud against shareholders.  18 U.S.C. § 1514A; Baker v. Smith & Wesson, Inc., 40 F.4th 43, 47-48 (1st Cir. 2022).  To satisfy the "protected activity" requirement, the employee must show that they had both a "subjective belief" and an "objectively reasonable belief" that the conduct they reported constituted a SOX violation.  Day, 555 F.3d at 55.

---

[1] Because the applicable standard here is the one employed in Sylvester, the Court will not address Defendant's arguments that Plaintiff failed to approximate the elements of shareholder fraud and therefore cannot satisfy the objectively reasonable belief prong of the analysis.

### a. Reasonable Belief

The question of whether Wirth engaged in protected activity is at the center of this case. Specifically, Salesforce argues that Wirth's activities do not constitute protected whistleblower activities because he has failed to allege he had a reasonable belief that Salesforce's conduct constituted shareholder fraud. [Dkt. 30 at 1].

### 1. Subjective Belief

"The legislative history of Sarbanes-Oxley makes clear that its protections were 'intended to include all good faith and reasonable reporting of fraud, and there should be no presumption that reporting is otherwise.'" Van Asdale, 577 F.3d at 1002 (quoting 148 Cong. Rec. S7418-01, S7420). Here, there is no indication that the Plaintiff filed his complaint in subjective bad faith.

To satisfy the subjective component of reasonable belief, an employee must "'actually believe[] the conduct complained of constituted a violation of pertinent law.'" Day, 555 F.3d at 54 n.10 (quoting Welch v. Chao, 536 F.3d 269, 277 n.4 (4th Cir. 2008)). In Day, the First Circuit noted that a "plaintiff's particular educational background and sophistication [is] relevant" to determining subjective belief. Id. at 54 n.10. Salesforce argues that despite Wirth's professional experience, by failing to establish a generally accepted definition as to what "real time" means in the marketing industry, Wirth can only sufficiently allege that Salesforce's definition of the term differed from his—"not that Salesforce fraudulently misrepresented [Genie's capabilities]." [Dkt. 21 at 14]. However, Wirth does not need to establish an industry definition of what "real time" means to establish subjective belief. He only needs to establish that he believed Salesforce's definition of "real time" was the same as his: a program can complete all of its functions within milliseconds. [See Dkt. 17 ¶ 12]. In his Amended Complaint, Wirth pointed out that Salesforce had written on its website, "What's new and

innovative here? . . . The first is that it is ***real-time, which means it collects and unifies data in milliseconds and lets brands act instantly***." [Id. ¶ 51 (emphasis added)].

Salesforce also alleges Wirth's Amended Complaint is inconsistent because he acknowledges some of Salesforce's CDP capabilities can function in real time, while others cannot. There is no inconsistency. The fact that some aspects of the Genie could function in milliseconds does not subtract from Wirth's main argument, which is that the CDP, in totality, could not operate in real time because it was only as fast as its slowest functions. [Id. ¶ 19].

Along those lines, Salesforce argues Wirth did not have "full, direct knowledge of Genie's capabilities" because he was excluded from numerous meetings regarding the CDP's real time integration, and he was fired two weeks before Dreamforce took place. [Dkt. 21 at 15; see also Dkt. 17 ¶¶ 41, 46-47]. In essence, Salesforce argues that Wirth's understanding of the progress on Genie's real-time capabilities was outdated and incomplete. [Dkt. 21 at 6]. Wirth concedes he did not have firsthand knowledge of what Salesforce planned to claim about the CDP's real-time capabilities at Dreamforce, but he was still overseeing the CDP team's work integrating real time into Genie. [Dkt. 17 ¶¶ 41-42]. But Wirth did not need to have worked at Salesforce until Dreamforce took place to surmise that by mid-August 2022, the CDP had not made significant or sufficient progress and Genie would not be able to execute all of its functions in real time by September 20, 2022. [Id.].

Accepting the well-pleaded factual allegations of the Amended Complaint as true, Wirth's belief was based on his years of professional experience in the marketing industry, developing a personalization technology at Evergage, positions at Salesforce, including overseeing the Salesforce team responsible for integrating real time technology into the CDP, and his work assisting draft scripts for the Dreamforce conference. Accordingly, Wirth

repeatedly shared his concerns with decisionmakers about Salesforce publicly announcing the CDP operated in real time without currently having that capability. Taken together, the Court finds that Wirth has adequately pleaded a reasonable subjective belief that Salesforce's plans could result in securities fraud.

### 2. Objective Belief

To be objectively reasonable, "th[e] belief must be reasonable for an individual in the employee's circumstances having his training and experience." Sylvester, 2011 WL 2517148, at *12. As such, objective reasonableness "'is evaluated based on the knowledge available to a reasonable person in the same factual circumstances with the same training and experience as the aggrieved employee.'" Id. at *12 (quoting Harp v. Charter Commc'ns, 558 F.3d 722, 723 (7th Cir. 2009)).

Salesforce contends that a reasonable person would not believe that its statements about real time processing integration into its CDP violated the law. "A reasonable person in Plaintiff's situation would know about the potential for different understandings of the undefined term 'real-time.'" [Dkt. 21 at 12]. But as Plaintiff explained, some of his previous roles in the marketing industry required him to be knowledgeable about the latest developments in the marketing industry and to track areas where there was a potential to gain a competitive advantage. [Dkt. 17 ¶ 21]. Wirth also had "numerous discussions with customers, technologists, analysts, and industry leaders about the benefits of real-time." [Id. ¶ 31]. This led him to believe "there was a generally accepted understanding" that real time meant a "program could complete all of its necessary functions within milliseconds." [Id.].

Defendant also argues that Plaintiff's Amended Complaint did not sufficiently allege an objectively reasonable belief because he had limited knowledge of Salesforce's real-time

processing integration of its CDP. [Dkt. 21 at 18]. Because Plaintiff was not involved in the meetings regarding the progress of Defendant's CDP, and a reasonable person with Plaintiff's background would know how much progress could be made in a few weeks, his conclusion of potential fraud was unreasonable. [Id.]. Wirth argues the opposite, however, and the Court must take all of Wirth's allegations at this stage to be true and give him the benefit of all reasonable inferences.

Moreover, much of Wirth's conduct occurred before the Salesforce meetings in which executives discussed Genie's real time functions or Dreamforce.[2] By the time those meetings took place in July or August 2022, Wirth had already shared his concerns with "numerous individuals within Salesforce" at monthly meetings that included visual progress reports demonstrating the status of the CDP team's integration work. [Dkt. 17 ¶¶ 34-35].

A plaintiff's belief must be grounded in facts, but the employee does not need to "wait until a law has actually been broken to safely register his or her concern." Sylvester, 2011 WL 2517148, at *14. Thus, Wirth's whistleblowing activity did not need to occur after a violation of one of SOX's enumerated statutes. "Section 806 exists not only to expose existing fraud, i.e., conduct satisfying the elements of a fraud claim, but also to prevent potential fraud in its earliest stages." Sylvester, at *21. In fact, fraud does not need to have ever occurred. See Day, 555 F.3d at 55 ("The employee is not required to show that there was an actual violation of the provision involved"). "Employees may still be protected by SOX's whistleblower provision 'if they are mistaken . . . that the conduct they reported in fact violated a specific law, rule, or regulation enumerated in § 1514A—provided that their mistaken belief was both subjectively

---

[2] Both parties refer to events that occurred after Wirth was terminated [see Dkts. 17 ¶¶ 44-58; 21 at 9-10], but they are not relevant to determining whether Salesforce violated the SOX whistleblower retaliation provision. Wirth alleges he engaged in protected activity and that Salesforce retaliated against him for it by terminating him. Therefore, the relevant time period ends when Wirth was terminated.

and objectively reasonable." Callahan v. HSBC Sec. (USA) Inc., No. 22-CV-8621, 2024 WL 1157075, at *4 (S.D.N.Y. Mar. 18, 2024); see also Welch v. Chao, 536 F.3d 269, 277 (4th Cir. 2008) (pointing out that the ARB has "held that § 1514A protects an employee's communications based on a reasonable, but mistaken, belief that conduct constitutes a securities violation.").

Ultimately, determining whether a plaintiff had a reasonable belief is an extremely fact dependent inquiry that is more appropriate for summary judgment. "'[T]he issue of objective reasonableness should be decided as a matter of law only when no reasonable person could have believed that the facts [known to the employee] amounted to a violation' or otherwise justified the employee's belief that illegal conduct was occurring." Rhinehimer, 787 F.3d at 811 (quoting Livingston v. Wyeth, Inc., 520 F.3d 344, 361 (4th Cir. 2008)).

Nevertheless, the information that was available to Plaintiff was sufficiently adequate to allow him to reasonably believe that a false statement about Genie's real time capabilities at Dreamforce could constitute fraud. Wirth may have lacked specific knowledge about whether Salesforce intentionally misrepresented material information to shareholders, but that is irrelevant for purposes of evaluating whether Salesforce violated the whistleblower retaliation statute. "An employee may not have access to information necessary to form a judgment on certain elements of a generic fraud claim, such as scienter or materiality, and yet have knowledge of facts sufficient to alert the employer to fraudulent conduct." Wiest, 710 F.3d at 134. Protected activity only needs to implicate "a reasonable belief" that "a violation is likely to happen." Id. at 133. Given his background and the factual circumstances, Wirth had enough information to sufficiently plead that he reasonably believed a violation of SOX was likely to happen.

14

## IV.     CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss [Dkt. 20] is **DENIED**.

**SO ORDERED.**

Dated: September 13, 2024                                      /s/ Angel Kelley
                                                               Hon. Angel Kelley
                                                               United States District Judge